IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DIETRICH WILLIAMS, ) | |
| ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 12 C 7852 |
| v. ) | |
| ) | Magistrate Judge Sidney I. Schenkier |
| CAROLYN W. COLVIN, Acting Commissioner ) | |
| of Social Security,[1] ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff Dietrich Williams, through his court-appointed guardian, Barbara Martin, seeks

reversal of a final decision by the Commissioner of the Social Security Administration

("Commissioner"), denying Mr. Williams's application for Supplemental Security Income

("SSI") (doc. # 23). The Commissioner has filed a cross-motion for summary judgment to

affirm the denial of SSI (doc. # 30). For the reasons set forth below, we reverse the

Commissioner's decision in part and affirm in part.

### I.

We begin with a summary of the administrative record and procedural history of this

case. In Part A, we discuss the general background information, the facts regarding Mr.

Williams's injury and disability, and Mr. Williams's resulting settlement agreement. In Parts B

and C, we describe the Illinois Disability Pooled Trust and then detail the creation of Mr.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), we have substituted Acting Commissioner of Social Security Carolyn W. Colvin as the named defendant.

[2] On December 4, 2012, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (docs. ## 15, 16).

Williams's supplemental needs trust, respectively. Then, in Part D, we address the ALJ's opinion, as well as the Appeals Council's opinion.

**A.**

Mr. Williams is disabled after suffering a traumatic brain injury caused by an automobile accident on March 25, 1991 (R. 54, 118). He filed a negligence action in the Circuit Court of Cook County against the City of Chicago, seeking compensation for his injuries arising from the accident (R. 47, 54). In September 1994, the Circuit Court of Cook County Probate Division ("Probate Court") adjudicated Mr. Williams disabled and appointed his mother, Barbara Martin, as his guardian (R. 118).

On November 30, 1994, the Circuit Court of Cook County Law Division ("Law Division") entered an order approving a structured settlement of the negligence action for a total of $650,000 (R. 42-60). The settlement agreement provided Mr. Williams with a lump sum payment of $82,593.12, which the court directed "shall be placed into an account" by Ms. Martin, as guardian, "in the name of Dietrich Williams"; the court further ordered that the account "shall be supervised by the Probate Division of the Circuit Court of Cook County" (R. 42, 45-46). In addition to the lump sum payment, the settlement agreement provided for the purchase of two annuity policies (R. 47-53). The two annuity policies, one issued by Transamerica Occidental Life Insurance Co. ("Transamerica") and one issued by Safeco Life Insurance Co. ("Safeco"), were to provide monthly payments to Mr. Williams starting on December 15, 1994, as well as scheduled lump sum payments payable on 13 occasions between 1995 and 2024 (R. 52–53). As part of its order approving the settlement, the court stated that the "Plenary Guardian is authorized and directed to . . . distribute the proceeds in accordance with the provisions of this Order subject to further Order of the Probate Division" (R. 46).

The structured settlement agreement contained a section regarding "Plaintiff's Rights to Payments," which stated in pertinent part:

> It being understood Plaintiff is and shall be a general creditor to the Defendant. Said payments cannot be accelerated, deferred, increased or decreased by the Plaintiff and no part of the payments called for herein or any assets of the Defendant is to be subject to execution or any legal process for any obligation in any manner, nor shall the Plaintiff have the power to sell or mortgage or encumber same, or any part thereof, nor anticipate the same, or any part thereof, by assignment or otherwise.

(R. 48). The Safeco Annuity contract contained the following section pertaining to assignment:

> An absolute assignment of this annuity contract will make the assignee the new owner of this annuity contract. We will not be bound by an assignment until written notice from the owner of this annuity contract is recorded at our home office.
>
> No payment under this annuity contract may be accelerated, deferred, increased, or decreased, or anticipated, sold, assigned, or encumbered in any manner by the annuitant (or either joint annuitant) or any other recipient of the payment.

(R. 39). Likewise, the Transamerica Annuity contract contained provisions regarding assignment rights. On the Schedule of Benefits page, a stamped Notice stated:

> This annuity contract has been placed in the possession of: Dietrich Williams for the sole purpose of perfecting a security interest that the above named has in his contract. The above named is not the owner of, and has no ownership rights in, this contract and may not assign or otherwise use it as any form of collateral. Please contact the issuer for further information.

(R. 58). The General Provisions page contained a section regarding "Change of Owner," which provides:

> An assignment of this policy will not be binding upon the Company until recorded at its Home Office. The Company assumes no responsibility for the sufficiency or validity of any assignment. However, when an assignment is filed with the Company and recorded at the Home Office, the owner's rights will be subject to it.

3

(R. 58A).  Both annuity contracts provided that Mr. Williams was the sole annuitant and creditor of the respective annuities (R. 35-41, 57-60).

## B.

The Illinois Disability Pooled Trust ("IL Trust") was established on July 17, 1998, by a Master Pooled Trust Agreement between the "Illinois Disability Association, as Settlor, and Co-Trustee along with LaSalle National Bank of Chicago, Illinois as Corporate Co-Trustee" (R. 462).  The Master Pooled Trust Agreement was made pursuant to 42 U.S.C. § 1396p(d)(4)(C), 305 ILCS 5/12–1(a), 89 Ill. Admin. Code § 120.347, and 760 ILCS 5/15.1, creating an "irrevocable pooled trust" for the "sole benefit of individual Beneficiaries who are defined as disabled pursuant to Section 1614(a)(3) of the Social Security Act, codified at 42 U.S.C. § 1382c(a)(3)" (R. 462, 465).  In order to participate in the IL Trust, a grantor and a trustee must execute a "Joinder Agreement" (R. 469).  After a Joinder Agreement is executed, a trust sub-account is established for the beneficiary; this trust sub-account is irrevocable: "A Grantor or other contributor to the Trust shall not be permitted to revoke a Joinder Agreement or withdraw any funds contributed to the Trust under such Agreement" (*Id.*).[3]  Once the trustee of the IL Trust receives and accepts assets from the grantor, the IL Trust agreement provides that "the Trust, as to the Grantor of such assets and the designation of the respective Beneficiary, shall be irrevocable and the contributed assets shall not be refundable" (*Id.*).  The agreement further provides that the "Grantor shall have no further interest in and does thereby relinquish and release all rights in, control over, and all incidents of interest of any kind or nature in and to the contributed assets . . . and all income thereon" (*Id.*).

---

[3] Amendments to the "Joinder Agreement" may only be made during the lifetime of the beneficiary and are "limited to changing any dispositive provisions relating to the identity of the designated Final Remainder Beneficiaries or their respective shares in any balance not retained by the Trust or paid to the state of Illinois as required by law" (R. 469).

4

The IL Trust was established as a supplemental needs trust (R. 464), which is a "type of trust that limits the trustee's discretion as to the purpose of the distributions. This type of trust typically contains language that distributions should supplement, but not supplant, sources of income including SSI or other government benefits." Programs Operation Manual System ("POMS") § SI 01120.200(B)(13).[4] Thus, the funds held in the IL Trust are to be "used only for supplemental needs and the supplemental care of a Beneficiary," with the "[i]ncome or corpus of the Trust [being] available to a Beneficiary only when the Trustee in its complete and absolute discretion elects to disburse such funds" (R. 464–65). "It is not the purpose nor objective of [the IL Trust] to provide for or to make expenditures for a Beneficiary's basic maintenance, support, medical, dental or therapeutic care, or any other appropriate care or service that may be paid for or provided by other sources" (R. 465).[5] In order to secure distributions, a beneficiary, or his representative, must provide documentation to the trustee for each distribution request (R. 466). The IL Trust agreement specifies that the trustee, in exercising its discretionary authority, "shall not exercise any discretionary powers herein granted to it in any manner which would disqualify a Beneficiary from qualifying for federal, state or local government benefits or programs which a Beneficiary may be entitled to receive on account of his or her disability or medical condition, unless determined by the Trustee to be necessary and advisable, notwithstanding the consequent loss of such benefit" (*Id.*).

---

[4] "The POMS is a handbook for internal use by employees of the Social Security Administration." *Parker v. Sullivan*, 891 F.2d 185, 189 n.4 (7th Cir. 1989). An electronic version of the POMS is available online at https://secure.ssa.gov/poms.nsf/home!readform.

[5] "[O]ther sources" refers to the intention of the Illinois Disability Association as the settlor and of the grantors not to "displace public or private financial assistance that may otherwise available to the Beneficiary" in order to avoid making those "[p]ublic and private assistance benefits. . . unavailable to any Beneficiary or be terminated because of the existence of this Trust" (R. 464-65).

**C.**

Ms. Martin, as Mr. Williams's guardian, filed a petition for leave to create a trust sub-account in the IL Trust; the Probate Court granted the petition on January 25, 1999 (R. 179-80). The Probate Court order permitted Ms. Martin to create a trust sub-account on behalf of Mr. Williams by execution of a Joinder Agreement (*Id.*). On March 5, 1999, the Probate Court then entered an "Order to Approve Budget and Transfer of Assets to Illinois Disability Pooled Trust" (R. 177-78). This order approved the transfer of assets from Mr. Williams's estate to the trust sub-account in the IL Trust in Mr. Williams's name, including the transfer of the Safeco and Transamerica annuities, "including monthly payments and lump sum distributions" (R. 178). The order stated that the transfer was "in the best interests of the Ward and his estate" (R. 177).

Subsequently, on March 16, 1999, Ms. Martin, as plenary guardian and grantor, enrolled in and adopted "The Illinois Disability Pooled Trust Fund Agreement" by completing and signing the Joinder Agreement (R. 61-89). In the Joinder Agreement section regarding "Source of Funds," Ms. Martin listed the structured settlement, as well as the Safeco and Transamerica annuities, as the source of funds to be placed in the IL Trust (68-69, 74). Both annuities have identical payment schedules, with each providing for "$500 paid monthly to Dietrich Williams for life with 30 years certain" and the following additional periodic payments:

| | | |
|---|---|---|
| 1995 - $5,000 | 2007 - $11,250 | 2020 - $20,000 |
| 1997 - $6,250 | 2010 - $12,500 | 2022 - $22,500 |
| 2000 - $7,500 | 2012 - $13,500 | 2024 - $50,000 |
| 2002 - $8,750 | 2016 - $15,000 | |
| 2005 - $10,000 | 2018 - $17,500 | |

(R.52-53). On April 1, 1999, the Probate Court entered an order providing as follows:

> That the budget approved on February 9, 1999 is the total budget for the Sub Account of Dietrich Williams in the Special Needs Trust. That the Trustee of the Illinois Disability Pooled Trust shall have authority to make the expenditures contained in the Budget approved on February 9, 1999. That upon the Ward

becoming eligible for governmental benefits, the Trustee shall discontinue making expenditures for which governmental resources are available therefor.

(R. 432). The budget approved on February 9, 1999, included a provision for groceries. household supplies, and drinking water in the amount of $525.00 per month and $300.00 per quarter for clothing (R. 429-30). From April 2008 through November 2009, the IL Trust disbursed $499.00 per month—paid to Ms. Martin, as Mr. Williams's guardian—for the purpose of purchasing groceries for Mr. Williams and from June 2008 to September 2009, $300.00 on a quarterly basis for the purchase of clothes for Mr. Williams (R. 419, 427). The disbursements also included payments directly to third-party vendors for Mr. Williams's electric bill, water bill, yearly property taxes, and yearly home insurance premium (R. 418-21, 426-28).

### D.

On November 14, 2008, Ms. Martin submitted an application for SSI benefits on behalf of Mr. Williams (R. 13F, 359). There is no dispute that Mr. Williams's 1991 brain injury has rendered him disabled with the meaning of the Social Security Act (R. 13H). However, Mr. Williams's application was denied initially and upon reconsideration, based on the conclusion that Mr. Williams was not financially eligible for benefits because he had excess countable income (R. 359-62, 245).

A Request for Hearing was filed on May 20, 2009 (R. 319), and a hearing before an ALJ was initially scheduled for December 1, 2009 (R. 23–28). After multiple rescheduled dates (R. 382, 18-22, 14D-17), on August 2, 2010, Mr. Williams's attorney requested that the ALJ decide the matter based upon the evidence in the record and waived the right to appear at a hearing (R. 662).

On October 14, 2010, the ALJ issued a written opinion finding that Mr. Williams was ineligible for SSI benefits for the months of December 2008; January, February, March, June,

September, and December of 2009; and February and March of 2010 due to excess countable income based on disbursements from the IL Trust to Mr. Williams for food and shelter expenses (R. 13F–14C). The ALJ cited POMS regional program circular CHI 07-001 pertaining to the Illinois Disability Pooled Trust for the ruling that "disbursements from a trust may be treated by the Social Security Administration as income received to the claimant under certain circumstances" (R. 13J, citing R. 370-71). The ALJ then analyzed the trust established on Mr. Williams's behalf, and observed that even though the trust agreement provides that the trustee may not exercise the discretionary powers to make distributions in any way that would disqualify a beneficiary from receiving government benefits, the trustee in this case had authorized cash payments for groceries and clothing to Mr. Williams's guardian on his behalf and to third-party vendors for shelter expenses (R. 13K). The ALJ found that these disbursements conflicted with the trust agreement, which allows for distributions for special or supplemental needs, meaning non-support distributions (R. 13L). The ALJ thus counted the cash disbursements for groceries and clothing to Ms. Martin, on Mr. Williams's behalf, as income, and the disbursements to third parties for shelter expenses as in-kind support and maintenance (R. 13L-13Y). The value of those disbursements in the months they occurred brought Mr. Williams's income to a level that precluded eligibility for SSI (R. 13M-14C).

However, the ALJ concluded that he lacked sufficient information to determine to whether the trust itself counted as a resource and whether the annuity payments into the trust counted as income (R. 13I-13J, 14B-14C). The ALJ stated that because the evidence before him failed "to establish that the claimant's original Joinder Agreement included irrevocable beneficiaries," he withheld judgment as to whether the trust assets would be considered a resource of Mr. Williams and whether the annuity payments to the IL Trust sub-account for Mr.

Williams would count as income (R. 14B-14C). Consequently, the ALJ held that Mr. Williams was potentially eligible for SSI benefits for the months of April, May, July, August, October, and November of 2009; as well as January and April of 2010, without determining the effect of the Safeco and Transamerica annuity payments into the trust during those months (R. 14B).

On November 29, 2010, Mr. Williams filed a request for the Appeals Council to review the ALJ's decision (R. 664). On December 7, 2010, an Assistant Regional Commissioner ("ARC") from the Social Security Administration's Division of Management and Operations Support issued a memorandum in response to the questions that the ALJ had left open: (1) whether Mr. Williams's trust sub-account was a resource; and (2) whether the Safeco and Transamerica annuity payments into the trust were income for SSI purposes (R. 665). The ARC explained that a trust constitutes a resource "if it is revocable, if the individual can direct the trustee to provide for his support and maintenance, or if the individual can sell a right to mandatory disbursements" (R. 666). An individual cannot revoke the trust when there are residual beneficiaries, and because the Joinder Agreement had an anti-lapse provision that created a contingent remainder interest, the ARC deemed the trust irrevocable (*Id.*). The ARC further explained that Mr. Williams cannot direct the trustee to use the assets for his support and maintenance, because the trustee has sole discretion to make disbursements; nor does the trust provide for mandatory disbursements (*Id.*). As a result, the ARC concluded that the trust sub-account was not a resource (R. 665-66).

In contrast, the ARC concluded that the annuity payments into the trust should be counted as income for SSI purposes (R. 666): "Per [POMS §] SI 01120.200(G)(1)(d), a legally assignable payment, that is assigned to a trust, is income for SSI purposes **unless** the assignment is irrevocable" (*Id.*) (emphasis in original). The ARC stated that "[t]he annuity contracts and

settlement agreement do not contain any provisions to make the assignment of the annuity payments irrevocable" (*Id.*). Thus, although the ARC considered the trust irrevocable, the ARC deemed the payments into the trust revocable and hence countable as income to Mr. Williams (*Id.*).

On June 15, 2012, the Appeals Council granted Mr. Williams's request for review (R. 667), and on July 26, 2012, the Appeals Council issued a decision finding that Mr. Williams is ineligible for SSI for the period from December 2008 through April 2010 due to excess countable income (R. 10-12A). The Appeals Council adopted the ALJ's findings and clarified that Mr. Williams was also not eligible for benefits for the months for which the ALJ refrained from making conclusive findings (*Id.*).

Beyond agreeing with the ALJ that certain disbursements from the IL Trust constitute income for SSI purposes, the Appeals Council, relying upon the ARC's opinion and citing POMS § SI 01120.200(G)(1)(d), found that the annuity payments into the trust also counted as income because "[t]he annuity contracts and settlement agreement do not contain provisions to make the assignment of the annuity payments irrevocable" (R. 10-11). The Appeals Council concluded that the annuity payments, "[w]hen added to the countable unearned income already assessed to the claimant for the period at issue, the total amount of unearned income exceeds the permissible thresholds for all months, including the months of 'potential eligibility'" determined by the ALJ (R. 11).

## II.

The Appeals Council granted Mr. Williams's request for review, making the Appeals Council's decision the final decision of the Commissioner. *Schoenfield v. Apfel*, 237 F.3d 788,

792 n.1 (7th Cir. 2001); *Walgren v. Colvin*, No. 12 C 6378, 2013 WL 4659565, at *1 (N.D. Ill. Aug. 29, 2013).

We reverse the Commissioner's final decision only if it is not supported by substantial evidence, is based on a legal error, or is too poorly articulated to permit meaningful review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). We uphold the decision if it is supported by substantial evidence, that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moore v. Colvin*, No. 13-2460, 2014 WL 763223, at *1 (7th Cir. Feb. 27, 2014) (citations omitted). The administrative decision must "build a logical bridge" between the facts of the case and the outcome. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

### III.

Mr. Williams claimed eligibility for SSI benefits under 42 U.S.C. § 1382. Section 1382 provides, in relevant part, that a person who is disabled is eligible for SSI benefits, if his income and resources do not exceed a particular amount set by statute. *White ex rel. Smith v. Apfel*, 167 F.3d 369, 371, 373 (7th Cir. 1999) (citing 42 U.S.C. § 1382(a)); *see* also 20 C.F.R. § 416.202(c). Mr. Williams disputes two aspects of the Commissioner's decision holding that he is financially ineligible for SSI (doc. # 23-1: Plaintiff's Memorandum in Support of Motion for Summary Judgment ("Pl.'s Mem.") at 3-4). *First*, Mr. Williams contends that the Appeals Council erred in finding that the Safeco and Transamerica annuity payments made to Mr. Williams's trust were income for purposes of determining SSI eligibility (*Id.* at 4-10). *Second*, Mr. Williams argues that the Appeals Council erred in adopting the ALJ's findings with regard to certain disbursements from the trust being treated as countable income rather than in-kind support and maintenance ("ISM") (*Id.*). We address each issue in turn.

Mr. Williams asserts that the Appeals Council erred when it determined that the annuity payments into the IL Trust count as income for purposes of determining his eligibility for SSI benefits. The ALJ's opinion laid out the background for deciding whether Mr. Williams's sub-account trust should qualify as a resource, and whether payments into that trust would constitute income (R. 13I-13J). The ALJ cited a legal opinion from the "Office of General Council for Region V (the region in which the claimant resides) dated September 20, 2002," which states that "trust assets would not count as a resource for the purpose of determining eligibility for supplemental security income benefits if the individual (grantor) names an irrevocable residual beneficiary (or beneficiaries)" (R. 13I). The ALJ observed that if the Joinder Agreement provided for irrevocable residual beneficiaries, then the trust would not count as a resource (*Id.*). In addition, the ALJ reasoned that if the trust principal did not count as a resource, then "this would also lead to a finding that the guaranteed payment to the Illinois Disability Pooled Trust for Dietrich Williams in February of 2010 for $12,500.00 would not count as income because it would be considered as an addition to the trust principal that was made directly to the trust" (R. 13I-13J). But, because the ALJ concluded that the evidence in the record before him failed to establish whether the Joinder Agreement included irrevocable beneficiaries, he found that he could not resolve whether the trust counted as a resource and whether the annuity payments into the trust would count as income (*Id.*, 14B-14C).

Upon granting review, the Appeals Council sought guidance from the ARC, who responded in the December 7, 2010 memorandum (R. 665-66). The ARC reviewed the Joinder Agreement and noted that although the section regarding whether the grantor reserved authority to amend the designation of remainder beneficiaries was not completed, another provision in the

agreement stated that "[i]f a lapse occurs in distribution, all remaining funds shall be retained as a part of the Trust's Remainder Share" (R. 666). The ARC found that this anti-lapse provision created a contingent remainder interest, rendering the trust irrevocable (*Id.*). Consequently, the ARC advised that "the trust is not a resource to Dietrich" (*Id.*).

The ARC, however, parted company with the ALJ's analysis of how that conclusion could affect the treatment of the annuity payments into the trust. The ARC advised that even though the trust was irrevocable and not a resource, the annuity payments into it did constitute income, relying on POMS § SI 01120.200(G)(1)(d), which states that:

> A legally assignable payment (see SI 01120.200G.1.c. for what is **not** assignable), that is assigned to a trust/trustee, is income for SSI purposes **unless** the assignment is irrevocable. For example, child support or alimony payments paid directly to a trust/trustee as a result of a court order, are not income. If the assignment is revocable, the payment is income to the individual legally entitled to receive it.

POMS § SI 01120.200(G)(1)(d) (bold in original). To support the conclusion that the annuity payments into the trust were revocable, the ARC offered only that "[t]he annuity contracts and settlement agreement do not contain provisions to make the assignment of the annuity payments irrevocable" (R. 666). The Appeals Council followed the ARC's advice on this issue, and incorporated that sentence into its opinion (R. 11).

### A.

Because social security regulations do not specify how to determine when payments into a trust will count as income for SSI purposes, the ARC and the Appeals Council relied upon the POMS, which is "a primary source of information used by Social Security employees to process claims for Social Security benefits" Social Security Public Policy Home, https://secure.ssa.gov/poms.nsf/Home!readform (last visited Mar. 27, 2014). Both Mr. Williams and the Commissioner cite to the POMS guidelines as relevant authority and quote *Washington*

*State Dept. of Soc. Servs. v. Keffeler*, 537 U.S. 371, 385 (2003), which states that "[w]hile the administrative interpretations [POMS] are not products of formal rulemaking, they nevertheless warrant respect . . . " (Pl.'s Mem. at 6 n.1; doc. # 31: Defendant's Memorandum in Support of Summary Judgment ("Def.'s Mem.") at 8 n.2).

POMS § SI 01120.200(G) addresses "Policy – earnings and additions to trusts." Section (G)(1)(b) initially states that "[a]dditions to trust principal made directly to the trust are not income to the grantor, trustee or beneficiary." However, Section (G) then identifies two exceptions, which, if applicable, would categorize the additions to the trust as income. The first exception applies when the payments into the trust are "non-assignable by law," *Id.* at 001120.200(G)(1)(c); the second applies to payments that, while legally assignable, are made pursuant to assignments that are revocable. *Id.* at 001120.200(G)(1)(d). Here, the Safeco and Transamerica annuity payments have been and will be added directly to Mr. Williams's IL Trust sub-account. Thus, under the relevant POMS guidance, those payments are not income unless one of these two exceptions apply.

Both the ARC's memorandum and the Appeals Council opinion focused solely on the second exception, Section SI 001120.200(G)(1)(d), which addresses whether a *legally assignable* payment should nonetheless be deemed as income because the assignment is revocable. In a single sentence, both the ARC and the Appeals Council concluded that the annuity payments into Mr. Williams's trust were revocable because "[t]he annuity contracts and settlement agreement" had no provisions making the assignment irrevocable (R. 666, 11). However, beyond its reliance on the conclusory ARC opinion, the Appeals Council offered no further factual or legal support for its finding that the annuity payments were revocable and should be counted as income. It did not explicitly quote or analyze the language of the annuity contracts or the settlement agreement;

nor did it mention or analyze the legal effect of the Joinder Agreement or any of the state court orders that directed that the annuity payments be made into the trust. The Appeals Council's cursory treatment of this issue falls short of supplying the reasoned explanation and the evidentiary support necessary to allow this Court to find that its decision is supported by substantial evidence and is legally sound.

Effectively acknowledging the infirmity of the Appeals Council's rationale, the Commissioner's lawyers concede in their brief before this Court that the Appeals Council's opinion was "incomplete" (Def.'s Mem. at 7). The Commissioner then attempts to side-step this deficiency by arguing that this incompleteness was merely a "subsidiary issue," and offering instead a completely new theory for concluding that the payments to the trust should count as income: that the payments were "non-assignable by law" and therefore governed by the first exception listed in Subsection (c) and not the second exception listed in Subsection (d) (*Id.* at 6-7).[6]

This new theory is a non-starter. The Appeals Council never addressed the factual basis for this argument – that the annuities and settlement agreement had "non-assignment clauses" – and never contended that the annuities fell within the purview of POMS § SI 01120.200(G)(1)(c), the exception that applies to payments that are "non-assignable by law." At a minimum, offering this new rationale runs afoul of the *Chenery* doctrine, which "forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced." *Parker*, 597 F.3d at 922 (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943));

---

[6] The government cites to POMS § SI 001120.200(G)(1)(**d**), the *second* exception, for the statements that "[c]ertain payments are non-assignable by law, and therefore are income to the individual entitled to receive the payment under regular income rules" and that a non-assignable payment "may not be paid directly into a trust, but individuals may attempt to structure trusts so that they are so paid" (Def.'s Mem. at 8-9). The quoted language actually is found in (G)(1)(**c**), the *first* exception. We assume that these incorrect citations are inadvertent typographical errors, but point them out because the erroneous citations might otherwise obscure the fact that the government is relying on a *different* exception than the one relied upon by the ARC and the Appeals Council.

*see Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012) ("On appeal, the Commissioner may not generate a novel basis for the ALJ's determination"). Indeed, this argument goes beyond the typical *Chenery* violation, in which the government seeks to defend a rationale offered by the agency based on a ground that may appear in the record but that the agency did not address. *See, e.g., Parker*, 597 F.3d at 922 (Commissioner's lawyer relied on physician reports that the ALJ had not mentioned). Here, the Commissioner seeks to abandon the rationale offered by the Appeals Council, in favor of an argument that is flatly inconsistent with the approach the Appeals Council took. By citing and relying upon Section SI 001120.200(G)(1)(d), which only comes into play for legally assignable payments, the Appeals Council found (or at least assumed) that the payments were "legally assignable." Had it concluded otherwise, the Appeals Council would have proceeded under the first exception, Section SI 001120.200(G)(1)(c), which applies to payments that are "non-assignable by law;" there would have been no occasion to consider whether the payments are irrevocable.

Offering a completely different rationale is not a course that, on review, the Commissioner is entitled to pursue. For the sake of completeness, however, we explain why on the merits the government's contention that the annuities were "non-assignable by law" would fail.

*First*, the annuity payments do not qualify as non-assignable by law based upon Section 155.34 of the Illinois Insurance Code, a law in effect at the time that the annuities were placed in the IL Trust. That section did not categorically forbid assignment of structured settlement payments; it only required that such assignments receive judicial approval. 215 ILCS 5/155.34. The Probate Court gave the approval required for the assignment.[7]

---

[7] The Probate Court's order authorizing the transfer provided sufficient judicial approval to satisfy section 155.34. And because we conclude (as we explain below) that a transfer to a trust on behalf of a disabled beneficiary

Moreover, that approval in no way contravened the Illinois statute. "The clear language of section 155.34(b) [of the Illinois Insurance Code] requiring court approval for assignments of payments presupposes that the payments are in fact assignable." *In re Nitz*, 739 N.E.2d 93, 98 (Ill. App. Ct. 2000). The purpose of requiring judicial approval is not to invariably bar assignments, but rather to protect the beneficiaries from those who would prey upon them, persuade them to trade their annuities for deeply-discounted amounts of cash, and leave them "penniless." *Id.* at 97. As another Illinois Appellate Court explained:

> the legislative history demonstrates one concern in promulgating section 155.34— the protection of structured settlement payment recipients from unscrupulous factoring companies, in particular, companies soliciting by use of 800 numbers. The clear intent of the legislature was to "'put out of business' the unscrupulous 800 numbers. . . . *There is no other concern or intent evident from the legislative discussions and no other basis for enacting section 155.34.*

*Shaffer v. Liberty Life Assurance Co.*, 746 N.E.2d 285, 293 (Ill. App. Ct. 2001) (emphasis added). Consequently, Section 155.34 neither makes structured settlements non-assignable by law, nor even applies to bar a transfer of the annuities that the Probate Court found was in Mr. Williams's best interests.[8]

*Second*, and in a similar vein, the contractual language in the settlement agreement and the two annuity policies does not render the annuity payments non-assignable by law. The language in the settlement agreement states "nor shall Plaintiff have the power to sell or mortgage or encumber the same, or any part thereof, nor anticipate the same, or any part thereof,

---

was not the type of transfer that the Illinois legislature sought to prohibit, we are not persuaded that the limitations on assignability in the settlement agreement and the annuity policies operated to render the Probate Court's approval a nullity (*see* Def.'s Mem. at 11-14 (arguing that the non-assignment provisions deprive the state courts of authority to approve assignments)).

[8] Section 155.34(b) later was repealed in 2004 by P.A. 93-502, § 97 and replaced with the Structured Settlement Act, 215 ILCS 153, in which the legislature's target again was assignments for consideration. See, e.g., 215 ILCS 153/15 (requiring judicial or administrative approval of "transfers" of structured settlement payment rights); 215 ILCS 153/5 (defining "transfer" to include assignments "made by a payee for consideration).

by assignment or otherwise" (R. 48). This language bars selling, mortgaging, or encumbering by assignment or otherwise, which does not obviously bar transferring the payments into a supplemental needs trust for the benefit of the payee. The Transamerica annuity contains language stating that Mr. Williams "may not assign or otherwise use it as any form of collateral" (R. 58). This language bars the assignment as collateral, but does not on its face prohibit the transfer to the trust. The Safeco annuity contains broader language, but still does not facially apply to transfers to trusts on behalf of the annuitant: "No payment under this annuity contract may be accelerated, deferred, increased, or decreased, or anticipated, sold, assigned, or encumbered in any manner by the annuitant" (R. 39). Indeed, the fact that each of the annuity policies contains a general provision requiring notice to the insurance companies to make any assignment of the policies effective (R. 39, 58A) is strong evidence that the annuities were not intended to be completely non-assignable.

As with Section 155.34, we view the underlying purpose of the limitations on assignment of the annuities in the settlement agreement and in the annuity contracts as seeking to protect Mr. Williams from wasting those assets. Those restrictions were not intended to prohibit payment of the full value of the annuities into a trust that would serve his best interests. The cooperation of Safeco and Transamerica with the assignment bolsters our conclusion that the clauses did not apply to the transfer of these annuities to the trust.

In the cases the Commissioner cites to contend that the contractual language here "unambiguously" barred the assignment (Def.'s Mem. at 12-13), the insurance companies litigated to prevent assignments that, unlike the case here, were made to companies offering discounted cash payments to the beneficiaries. *See Shaffer*, 746 N.E.2d at 287 (Liberty Life Assurance and Keyport Life Insurance opposed assignment of payments under structured

settlement agreement to Singer Asset Finance Company); *In re Nitz*, 739 N.E.2d at 96 (Safeco intervened to oppose the assignment of structured settlement agreement payments to Singer Asset Finance Company); *Piasecki v. Liberty Life Assurance Co.*, 728 N.E.2d 71, 72 (Ill. App. Ct. 2000) (Liberty Life Insurance and Keyport Life opposed assignment of payments under structured settlement agreement to Stone Street Capital); *Green v. Safeco Life Ins.*, 727 N.E.2d 393, 394 (Ill. App. Ct. 2000) (Safeco opposed assignment of structured settlement agreement payments to Stone Street Capital); *Henderson v. Roadway Express*, 720 N.E.2d 1108, 1109 (Ill. App. Ct. 1999) (Liberty Life Assurance and Keyport Life opposed assignment of payments under structured settlement agreement to Singer Asset Finance Company); *see also In re Estate of Powless*, 734 N.E.2d 111, 115-16 (Ill. App. Ct. 2000) (Safeco opposed assignment of payments under structured settlement agreement to J.G. Wentworth for lump sum cash payment—court upheld assignment based on lack of anti-assignment language in annuity or settlement agreement and held that section 155.34 does not forbid assignments, but only requires judicial approval). These cases suggest that insurance companies will step in to enforce their anti-assignment language to oppose assignments to third parties for consideration. Here, the acquiescence of Safeco and Transamerica in the assignments to Mr. Williams's trust supports the conclusion that the language they included in the annuities does not apply to a transfer to a trust for the benefit of a disabled person.

*Third*, it is far from obvious that the POMS exception on which the Commissioner now seeks to rely even covers the type of transfer involved here. This exception states:

> Certain payments are non-assignable by law and, therefore, are income to the individual entitled to receive the payment under regular income rules. They may not be paid directly into a trust, but individuals may attempt to structure trusts so that it appears they are so paid. Non-assignable payments include:

Temporary Assistance to Needy Families (TANF)/Aid to Families with Dependent Children (AFDC);
Railroad Retirement Board-administered pensions;
Veterans' pensions and assistance;
Federal employee retirement payments (CSRS/FERS) administered by the Office of Personnel Management;
Social Security title II and SSI payments; and
Private pensions under the Employee Retirement Income Security Act (ERISA) (29 U.S.C.A. section 10569(d)).

POMS § SI 01120.200(G)(1)(c). This list, even if non-exclusive and only illustrative, suggests that the assignments are "non-assignable by law" only when there is a statutory prohibition on assignments of the payments at issue. As discussed above, there is no statutory prohibition barring assignment of Mr. Williams's structured settlement agreement or the annuities to a special needs trust for his benefit.

In sum, we conclude that the government may not now seek to defend the Appeals Council's decision by arguing that the Safeco and Transamerica annuities are non-assignable by law. We further conclude that even if the government were entitled to now assert that argument, it would fail on the merits.[9]

**B.**

We now consider the grounds that the agency itself embraced in deciding that the annuity payments into the trust are income: that the transfer of the annuity policies into the trust was

---

[9] We recognize that in one other case where the Appeals Council failed to address the assignability of certain benefits to a trust, the court elected to remand the case for further consideration. *See Harris v. Astrue*, No. 5:11cv041, 2012 WL 4470472, at *3 (W.D. Va. Sept. 27, 2012). We do not follow that course here, for two reasons. *First*, we deem it inappropriate to give the Commissioner a second bite at the apple by allowing the agency now to consider the assignability issue only after the agency's reliance on the irrevocability issue has failed to pass muster. *Second*, in this case, the parties (and the Court) agree that the issue of whether these annuities were non-assignable presents a question over which the Commissioner has no special expertise and which this Court should decide (Pl.'s Resp. at 6; Def.'s Mem. at 18-22).

revocable. Our review of the evidence in the record convinces us that the Appeals Council erred as a matter of law in finding the payments into the trust were revocable.[10]

The Appeals Council's conclusory ruling that the annuity contracts and the settlement agreement did not specify that the assignments were irrevocable focused on the wrong documents: ones that were drafted *before* Mr. Williams's sub-account trust was even created. In so doing, the Appeals Council overlooked the ample evidence -- found in the documents that created and funded his trust, including court orders, the Master Trust Agreement for the IL Trust, and the Joinder Agreement -- demonstrating that the assignment of the annuities was irrevocable. (R. 45-46 (11/30/94 Law Division order); R. 179-80 (1/25/99 Probate Court order); R. 177-78 (3/5/99 Probate Court order); R. 61-89 (3/16/99 Joinder Agreement); R. 462-85 (IL Trust Master Pooled Trust Agreement)). These court orders and trust documents reveal that the assignment of the Safeco and Transamerica annuities into Mr. Williams's trust was irrevocable.

Interpretation of a court order is a matter of law that is not unique to social security cases; and it is a matter on which this Court has no less experience than the ALJ or the Appeals Council. *Rios v. Astrue*, No. 09 C 7348, 2010 WL 4736485, at *6 (N.D. Ill. Nov. 15, 2010). We are similarly well-situated to interpret the language of the IL Trust and Joinder Agreements. *See Espevik v. Kaye*, 660 N.E.2d 1309, 1313 (Ill. App. Ct. 1996) ("it is the duty of the trial judge to interpret [a trust] agreement" and that, absent ambiguity, a court must determine the intent of a trust "solely by reference to [its] plain language"); *see also Storkan v. Ziska*, 94 N.E.2d 185, 188 (Ill. 1950) ("[g]eneral rules of construction of written instruments apply to the construction of

---

[10] Indeed, the Commissioner all but abandons the Appeals Council's rationale for its decision, stating merely that the "legal conclusion was correct–payments into a trust are unearned income under the regulations. See 20 C.F.R. § 416.1121(a). However, its legal rationale for how it resolved a subsidiary issue–whether payments fell under an exception under POMS SI § 011200(G)(1)(d) for lawfully and irrevocably-assigned payments–was incomplete" (Def.'s Mem. at 6-7). The remainder of the Commissioner's argument on this point focused solely on whether the payments were legally assignable, without further analysis or support for the Appeals Council's conclusion that the assignments were revocable.

trust instruments, whether they are contracts, deeds, or wills"); *Rios*, 2010 WL 4736485, at *5

(interpretation of trust instrument governed by Illinois law). When interpreting a court order,

Illinois law instructs that "[a] court order must be interpreted in its entirety, having reference to

other parts of the record, including the pleadings, the motions before the court and the issues to

be decided. . . . Orders are to be construed in a reasonable manner so as to give effect to the

apparent intent of the trial court." *Granville Beach Condominium Ass'n v. Granville Beach*

*Condominiums, Inc.*, 592 N.E.2d 160, 163 (Ill. App. Ct. 1992) (citations omitted).

The Master Pooled Trust Agreement that established the IL Trust created an "irrevocable

pooled trust" (R. 465) and provides that once assets are accepted by the trustee, the trust is

irrevocable:

> [T]he Trust, *as to the Grantor of such assets and the designation of the respective Beneficiary, shall be irrevocable and the contributed assets shall not be refundable.* By execution of the Joinder Agreement, Grantor acknowledges that upon funding of a Sub-Account of this Trust, Grantor shall have no further interest in and does thereby relinquish and release all rights in, control over, and all incidents of interest of any kind or nature in and to the contributed assets (including the original contribution to the Trust and any and all subsequent additions to the Trust) and all income thereon.

(R. 469) (emphasis added). On March 16, 1999, Ms. Martin executed a Joinder Agreement to set

up a sub-account trust on behalf of Mr. Williams, which identified the funds to be poured into

the trust as the assets from Mr. Williams's structured settlement of his personal injury lawsuit

and specifically listed the Safeco and Transamerica annuities (R. 69, 74). The Joinder

Agreement acknowledged that the funding of the sub-account trust was irrevocable: "Each

Grantor acknowledges that upon execution of the Joinder Agreement by Grantor and the Trustee,

and the funding of a Sub-Account for a Beneficiary, that this Trust, as to the Grantor and

Beneficiary, is irrevocable" (R. 86). The language of the Master Pooled Trust Agreement and

the Joinder Agreement leave little doubt that the assignment of the two annuities was irrevocable once the trustee accepted them into the trust.

An examination of the relevant court orders that authorized Ms. Martin to transfer the two annuities to Mr. Martin's trust further persuades us that the assignment was irrevocable. On November 30, 1994, the Law Division ordered Mr. Williams's guardian, Ms. Martin, to place the remainder of the settlement proceeds after payment of specified attorney's fees and costs and a lien on behalf of the Illinois Department of Public Aid, into an account on behalf of Mr. Williams, which "shall be supervised by the Probate Division of the Circuit Court of Cook County" and that the guardian was "authorized and directed" to distribute the proceeds "in accordance with the provisions of this Order subject to further Order of the Probate Division" (R. 45-46).

Subsequently, the Probate Court entered two orders effectuating the transfer of the annuities to Mr. Williams's trust. The January 25, 1999 order granted leave to create Mr. Williams's trust sub-account pursuant to a Joinder Agreement (and adding amendments to the Joinder Agreement that are not relevant to the present analysis), and contained a clause allowing the trust to be terminated by court order upon a showing that Mr. Williams was no longer a disabled person ("restoration clause") (R. 179-80). The final paragraph declared that the restoration clause would be null and void, if state or federal law changed to render the beneficiary of a trust containing such a clause ineligible for government benefits (R. 180). Thus, the order revealed an intent to comply with state and federal requirements for the trust in order to allow the beneficiary to maintain eligibility for government benefits. An intent to maintain the beneficiary's eligibility also supports a conclusion that the transfer of the annuities to the trust was irrevocable.

In addition, the March 5, 1999 order held that "it is in the best interest of the Ward and his estate that . . .the transfer of assets from this Estate to the Illinois Disability Pooled Trust be effected as set forth below" and ordered that "the Guardian of the Estate is authorized to arrange for the transfer from the Estate" to Mr. Williams's trust, among other items, "Assignment of Safeco Annuity Policy" and "Assignment of Transamerica Occidental Life Insurance Co. Annuity Policy" (R. 177-78). Under Illinois law, the guardian of the estate "*shall* apply the income and principal of the estate so far as necessary for the comfort and suitable support and education of the ward . . . or for any other purpose which the court *deems to be for the best interests of the ward,* and the court may approve the making on behalf of the ward of such agreements as the court determines to be for the ward's best interests." 755 ILCS 5/11a-18(a) (emphasis added).

In cases involving statutory interpretation, Illinois courts construe the word "shall" as "a clear expression of . . . [an] intent to impose a mandatory obligation." *People v. O'Brien*, 754 N.E.2d 327, 330 (Ill. 2001). Because the Probate Court order specified that the assignment of the annuity policies was in the best interests of Mr. Williams and his estate, Illinois law created a mandatory obligation for Ms. Martin to assign the annuity policies in their entirety. [11] Furthermore, the Probate Court only specified one vehicle into which to assign the annuity policies and payments: the IL Trust. Viewed in this context, the Probate Court's statement that the guardian is "authorized" to assign the annuities to the trust was not, as the Commissioner argues, merely permissive (Def.'s Mem. at 15). Rather, Illinois law makes the court's order a mandate once the Probate Court determined – as it did – that the transfer of assets and assignment of annuities was in the best interests of Mr. Williams.

---

[11] Under Illinois law, a guardian of the estate is permitted with leave of the court, both to create irrevocable trusts and assign rights under annuity policies. 755 ILCS 5/11a-18(a-5)(6) & (8)(ii).

Taken as a whole, the January 25, 1999 and March 5, 1999 Probate Court orders, read in conjunction with the November 30, 1994 Law Division order, the Joinder Agreement and the Master Trust Agreement display the intent to make irrevocable the assignments of the annuity payments. We conclude that the transfer of the annuity payments into the trust was an irrevocable assignment. Because the assignments were irrevocable, the Appeals Council erred in concluding that those payments should be counted as income to Mr. Williams in determining his eligibility for SSI benefits.

## V.

Mr. Williams also disputes the Commissioner's conclusion that the distributions from the IL Trust counted as unearned income for the purposes of SSI benefits. The ALJ determined that because the trustee made discretionary distributions directly to Ms. Martin, on behalf of Mr. Williams, to pay for groceries and clothes, these payments counted as unearned income and pushed Mr. Williams over the income threshold for the months of December of 2008; January, February, March, June, September, and December of 2009; and February and March of 2010 (R. 14B).

For the purposes of SSI, "income" is defined as "anything you receive in cash or in kind that you can use to meet your needs for food and shelter." 20 C.F.R. § 416.1102. Although the trust is not a resource in Mr. Williams's case, even when the "trust principal is not a resource, disbursements from the trust may be income to the SSI recipient, depending on the nature of the disbursements." POMS § SI 01120.200(E)(1).

Mr. Williams contends that the ALJ erred in concluding that the disbursements from the trust for groceries and clothing paid to Ms. Martin on Mr. Williams's behalf constituted payments directly to Mr. Williams. He asserts that the disbursements should be deemed

payments to a third party who provides food and shelter, and should either be limited by the presumed maximum value or, based on a POMS Recent Change transmittal, should not be counted as income at all (Pl.'s Mem. at 10-12). In contrast, the Commissioner argues that the ALJ properly found that the trust disbursements made to Ms. Martin for Mr. Williams's food and clothing qualified as countable income as cash paid directly from the trust to the individual because Ms. Martin, in her capacity as guardian, received the cash as the agent of Mr. Williams (Def.'s Mem. at 23–24) (citing POMS § SI 01120.020(A) & (C)(1) (sections addressing transactions involving agents)). Several provisions in the POMS support the Commissioner's position that a guardian or conservator is considered an agent for SSI purposes, such that payments to the guardian, as agent for the ward, would constitute payments to the ward, rather than as reimbursement to a third party. See POMS § SI 01120.020(B)(1) & (2); POMS § SI 00810.120(D)(1) ("[t]reat monies received by an agent acting on behalf of an SSI beneficiary" are treated "as if the beneficiary received the monies directly. These monies are charged as income to the beneficiary when received by the agent, following the income-counting rules").

Because we find that the administrative decision on this issue comports with the Social Security Administration's internal guidelines, we decline to disturb the ruling. Thus, this Court affirms the ALJ's determination that the monthly payments from the IL Trust for groceries, and the quarterly payments for clothing, to the guardian on behalf of Mr. Williams should be counted as unearned income for the purposes of determining SSI benefits. We further agree with the Commissioner that the disbursements from the IL Trust, paid directly to third-party vendors by the trustee, for Mr. Williams's electric bill, water bill, yearly property taxes, and yearly home insurance premium are considered in-kind support and maintenance and thus calculated using the presumed maximum value. See POMS § SI 01120.200(E)(1)(b); 20 C.F.R. § 416.1130.

## CONCLUSION

For the reasons set forth above, this Court grants the Commissioner's motion for summary judgment on the issue of the treatment of the distributions from the trust as income, and denies the Commissioner's motion regarding the annuity payments into the trust. This Court grants Mr. Williams's motion for summary judgment on the issue of the annuity payments into the trust and remands for the Commissioner to recalculate Mr. Williams's entitlement to benefits consistent with this opinion on this issue, but denies Mr. Williams's motion for summary judgment as to the treatment of the distributions from the trust.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

DATE: March 31, 2014